UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID CLEVELAND,

                Plaintiff,               CIVIL ACTION NO. 06-13780

          v.                      DISTRICT JUDGE NANCY G. EDMUNDS

LIBERTY LIFE ASSURANCE        MAGISTRATE JUDGE VIRGINIA MORGAN
COMPANY OF BOSTON;
COMPUWARE CORPORATION
LONG TERM DISABILITY PLAN,

                Defendants.
_____/

## REPORT AND RECOMMENDATION

      This matter is before the court on motion of the parties for Entry of Judgment.  This is an

action brought pursuant to ERISA 29 U.S.C. §1132(a)(1)(B) in which plaintiff contends that

defendant's finding that plaintiff was not entitled to continuation of long term disability (LTD)

benefits because he was capable of returning to his own occupation was arbitrary and capricious,

as well as erroneous.  Plaintiff names as defendants Compuware Long Term Disability Plan[1] and

Liberty Life.  Liberty Life is the insurer for benefits under the plan provided by plaintiff's

employer Compuware, and is also the administrative decision maker concerning plaintiff's

entitlement to benefits.  For the reasons discussed in this Report and using *MetLife v. Glenn*, 128

_____

      [1]The Plan should be dismissed as it had nothing to do with determining plaintiff's
entitlement to benefits.  See, *Daniel v. Eaton Corp*, 839 F.2d 263, 266 (6th Cir.), *cert. denied*,
488 U.S. 826 (1988) (proper defendant is party responsible for administering and interpreting
Plan).

-1-

S.Ct. 2343 (2008) as a guide, it is recommended that the plaintiff's motion for judgment be granted, defendant's denied, and the decision denying benefits be reversed.

## A. ERISA

Congress enacted ERISA to "'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to provide for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004), quoting 29 U.S.C. §1001(b) (2000). A participant may bring a civil action under §502(a)(3)(B) to obtain appropriate equitable relief to address violations of the statute or terms of the Plan and /or to enforce any provisions of the statute or terms of the Plan. See, *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996). Courts have been directed to develop substantive federal common law as necessary to interpret ERISA and fashion remedies to effectuate the policies underlying ERISA. 29 U.S.C. § 1132(a); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109-110 (1989). ERISA generally preempts all state laws that relate to Employee Benefit Plans. 29 U.S.C. § 1144(a).

Generally, federal district courts have exclusive jurisdiction over civil actions brought under ERISA, including claims alleging breach of fiduciary duty, claims requesting equitable relief, other than benefit claims and claims involving statutory penalties under ERISA. 29 U.S.C. § 1132(e)(1). In civil actions brought under 29 U.S.C. § 1132(a)(1)(B) to recover benefits under the terms of the Plan, enforce rights under the terms of the Plan, or clarify the participant's rights to future benefits under the Plan, federal and state courts have concurrent

jurisdiction.  29 U.S.C. § 1132(e)(1).  The amount in controversy or the citizenship of the parties

is irrelevant.  29 U.S.C. § 1132(f).

**B. ERISA Standard of Review**

While ERISA governs the Employee Benefit Plan in general, whether a claimant is

entitled to disability benefits is determined by the language set forth in the individual Plan.

The United States Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch* that "a denial of

benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the

benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan."  489 U.S. at 115.  Where the benefit plan grants

the administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the Plan, the more deferential arbitrary and capricious standard of review is

appropriate.  *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

However, where the administrator of the Plan both determines eligibility for benefits and pays

the benefits from its own funds, a conflict of interest is presumed and such conflict must be

weighed as a factor in review of the decision.  *Metropolitan Life v. Glenn*, 128 S.Ct. 2343, 2348

(2008) [a case arising from the Sixth Circuit, 461 F.3d 660, 666 (6th Cir. 2006)], *Firestone Tire*

*and Rubber v. Bruch*, 489 U.S. 101, 115 (1989).

Thus, a reviewing court should first examine the Plan to determine whether defendant is a

Plan administrator or fiduciary, and whether the required discretion has been given.  Federal

common law rules of contract interpretation apply to ERISA Plans and those rules dictate that

this Court interpret the Plan's provisions according to their plain meaning and in their ordinary

and popular sense. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998). Here, the parties agree that the arbitrary and capricious standard of review applies. The court should also consider whether there is an inherent conflict of interest. Here, there is as Liberty Life both determines eligibility and pays benefits.

## C.  JUDICIAL REVIEW OF ERISA CLAIMS

In reviewing a denial of benefits under an ERISA plan, the court is limited to a review of the evidence that was before the Plan administrator when the final decision to deny benefits was made. *Wilkens v. Baptist Healthcare System*, 150 F.3d 609, 619 (6th Cir. 1998); *Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir. 1990); *Eriksen v. Metropolitan Life Insurance,* 39 F. Supp. 2d 864, 865 (E.D. MI 1999). Under the arbitrary and capricious standard of review, the decision of the ERISA benefit plan administrator denying or granting benefits is not subject to reversal if it is reasonable in light of the plan's provisions. *Davis v. Kentucky Finance Co. Retirement Plan*, 887 F.2d 689, 694-95 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990) (as long as the decision has some rationale or reasonable basis, it must be upheld).

 A court upholds the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Bennet v. Kemper National Services*, 514 F.3d 547, 552-53 (6th Cir. 2008), and *on remand Bennett v. Kemper*, 2008 WL 5273664 (E.D. MI 12/18/2008)(Cook, J.). Although this standard is deferential, it is "no mere formality." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *cert. granted*, 128 S.Ct. 1117 (regarding conflict of interest issues), opinion at *MetLife v. Glenn*, 128 S.Ct. 2343 (2008).

Rather, application of the standard requires review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.

## D. PLAINTIFF'S CASE

Plaintiff was employed for some thirteen years by Compuware as a computer programmer/analyst. Born in 1946 (LL-0482),[2] he suffers from chronic severe heart conditions including congestive heart failure, cardiomyopathy, atrial fibrillation, ventricular tachycardia, obesity (status post bariatric surgery), depression, sleep apnea, herpes zoster, and consequential fatigue and pain. In January, 2004, plaintiff applied for short term disability benefits. He submitted information to Liberty Life that he had become disabled on January 5, 2004, as a result of a cardiac condition. (LL 0074) Although initially denied benefits by Liberty, plaintiff administratively appealed and received short term benefits for the maximum period allowed, i.e. six months.[3] (LL 0816,0064)

Then plaintiff requested long term benefits. He received these from July 3, 2004, through March 28, 2005. Liberty Life advised plaintiff to file for social security disability benefits. Plaintiff notified Liberty Life by letter dated January 28, 2005, that he had been awarded SSDI (social security disability benefits) retroactive to June, 2004. The Social Security Agency found him disabled as of December, 2003. Liberty then demanded reimbursement of overpaid benefits

---

[2]References are to Liberty Life Administrative Record filed with the court (D/E #45).

[3]Liberty Life submits that the essential reason for short term benefits was because plaintiff was restricted from driving, and Compuware required plaintiff as a computer programmer/analyst to be "on call" and available on two hours notice. Thus, only for his work at Compuware, was driving necessary.

due to receipt of SSDI benefits.[4]  (LL 0310-313)  After Liberty Life terminated his LTD benefits, plaintiff appealed.  His appeal was denied.  He then filed this action.

The Plan sets forth the definition of Long Term Disability: "In order to be eligible for long term benefits a person must have a medical condition which results in his inability to perform the material duties of his own occupation."  (LL-0006)  In determining a person's own occupation for purposes of benefit eligibility Liberty Life can consider the person's occupation as it is normally performed in the national economy.[5]  (LL-0008)  Liberty Life determined that in its opinion the computer programmer/analyst is performed nationally the job is sedentary with at most a light physical demand.  (LL-0630, 0602)

Under the Plan's provisions, plaintiff has the burden to submitting proof of disability to Liberty Life, including diagnoses, chart notes, lab findings, test result, x-rays, and other forms of objective medical evidence.  (LL-0009)  Plaintiff submitted these medical records and test results.

Plaintiff received LTD benefits through March 28, 2005, and the more recent medical records are summarized here.

•     March 3, 2004: Dr. Milford, plaintiff's treating physician, reports that plaintiff is totally and permanently disabled.  He is unable to do any type of gainful employment, he cannot stand or tolerate a prolonged period of productive time.  He is on multiple anti-congestive heart failure medications including Vasotec, Coumadin, Spironolactone, Norvasc, Lasix, Coreg, Lanoxin, and Sotalol.  (LL-0344-5)

---

[4]Liberty Life had advised plaintiff to apply for SSDI or have the LTD benefits reduced. (LL0316-317)  The Policy provides that the LTD benefits are reduced by the initial amount of SSDI benefits.  (LL 0016-0022)

[5]This is not disputed by plaintiff.

• July 19 to 22, 2004, plaintiff was hospitalized for tremors in his arms and legs, dizziness, and blurred vision. This information was not provided to Liberty until September 10, 2004. (LL-0393-0395)  The hospital records show depression, cardiac problems, chronic facial pain. (LL-0400-0425)  Psychotherapy was recommended with plaintiff to return in three months. (LL-0395)  Psychological records show that plaintiff underwent a psychological evaluation in May, 2004.  He worked for Compuware for 13 years.  He was previously a teacher and coach and, premorbidly, he was active.  He was a jet fighter pilot form 1969 to 1971 and played basketball in college at Western Michigan.  He coached three sports while he was a teacher.  He was involved in a motor vehicle accident in 1996, his car fish-tailed and there was a collision.  He reports currently experiencing stress related to his disability status.  He returned to work only to be re-hospitalized.  All his cardiologists feel that he is medically disabled and not able to work.  They feel that the stress of returning to work could be lethal but the insurance company denied him benefits.  Psychological testing (34 on Beck's test) showed that plaintiff had a severe degree of clinical anxiety.  He had a fear of something terrible happening, inability to relax, fear of losing control, and a number of psycho-physiological symptoms.  His score of 23 on Beck's indicates a moderate degree of depression. His symptoms included dysphoria, pessimism, anhedonia, feelings of guilt and tearfulness, social withdrawal and irritability, indecisiveness, reduced libido, fatigue and other issues.  (LL-0396-0397)

• July 27, 2004, consulting physician Dr. Cuevas reports on plaintiff's status. (LL-0470-0477)  Dr. Cuervas summarizes plaintiff's condition and suggests that the attending physician be called to discuss the June 17 visit of dizziness, fatigue, and shortness of breath.  Dr. Cuervas opines that plaintiff is able to perform his sedentary job as evidenced by his reports of engaging in light housework, ability to walk 30 minutes, and absence of signs of heart failure on physical findings. (LL-0470)  Dr. Cuervas notes that plaintiff had stomach reduction surgery resulting in weight loss from 392 pounds to 257 pounds by December 31, 2003. (LL-0473)  His weight was 266 when seen by Dr. Milford in June 2004. (LL-0476)  Plaintiff also reported continuing neuralgia from his herpes infection on that occasion as well as the dizziness, fatigue, and shortness of breath. (LL-0476)  Dr. Cuervas notes that the records report that stress related to work was the cause of his hospitalization, he believed that the hospitalizations could be blamed on recurrent atrial fibrillation and arrhythmia. (LL-0471)  He did note that depression was beyond his expertise (LL-0470) but then opined that plaintiff was on Zoloft and "It is not clear that he requires additional treatment." (LL-0471)  He further states that "Despite the cardiologist's opinion that he is totally and permanently disabled, the claimant continues to engage in work activities typical of sedentary level of physical exertion." (LL-0472)[6]

_____

[6]Dr. Cuervas summarizes plaintiff's May 2004 activities questionnaire: sit 15-30 minutes, stand 15 minutes, walk 30 minutes.  He sits most of the day, does minimum amount of standing

- August 23, 2004, Dr. Milford's records show that he reported to Dr. Pursley on that date that plaintiff has non-ischemic cardiomyopathy with atrial fibrillation and AICD for VT. He also has sleep apnea and is status post bariatric surgery and herpes zoster (shingles) of the face. He weighs 279 pounds; blood pressure 112/76. He had a recent upper GI bleed for which he was seen at St. Joseph's Hospital. (LL-0323)

- A 24-hour Holter monitor on September 24, 2004, showed occasional paced rhythm, occasional PVCs, occasional PACs, no pauses. (LL-0325)

- September 22, 2004, Heart Care of Waterford, MI, reports on plaintiff's echocardiogram. It showed mild left ventricular hypertrophy, hypokinesis of the apical septal wall with a mildly reduced estimated ejection fraction of 50 to 55 percent. The left atrium is mildly dilated. The Doppler study revealed mild mitral and tricuspid regurgitation. Pacer wire noted in the right heart. (LL-0326)

- September 20, 2004, Dr. Weissman's review. (LL-0361) He summarizes plaintiff's condition as follows: Plaintiff is a 57 year old male who developed a viral myocarditis in 1998 at which time ejection fraction was markedly reduced to the 11 percent range. Cardiac catheterization revealed a dilated cardiomyopathy with normal coronary arteries. There were problems with shortness of breath, congestive heart failure, paroxysmal atrial fibrillation (PAF), obesity after bariatric surgery, history of sleep apnea, history of herpes zoster involving the trigeminal nerve. Plaintiff was treated appropriately with medical therapy, including Coumadin, Spironolactone, Lasix, Lisinopril, and Stalol for paroxysmal atrial fibrillation. He also received Neurontin, Lortab for pain, Clozaepam for anxiety, and Zoloft for depression. The cardiac catheterization in 1998 showed additional evidence of pulmonary hypertension, dilated left and right ventricle and severe left ventricular dysfunction. There were hospitalizations with PAF in October 2003 at which time he developed atrial fibrillation and ultimately went through elective DC cardioversion. After returning to sinus rhythm, he again developed atrial fibrillation in December 2003 where he was found to have atrial fibrillation with rapid ventricular response. He also was documented to have periods of ventricular tachycardia. In December 2003 he had another DC cardioversion and then placement of a dual chamber

---

and walks 30 minutes (as directed by physician). Mostly rests, sits in recliner, or lays down. Takes nap for 2 hours midday and spends 6 hours in bed. Can sit 30 minutes in a car; goes up and down stairs sometimes but legs are weak and he gets out of breath. Unable to concentrate on anything for more than 15-20 minutes. Has some short-term memory failure, 40 percent ejection fraction, tires easily, shortness of breath, hands shake, dizzy and lightheaded, unable to drive, depressed. Does some light housework including dishwashing, laundry, vacuuming, and sometimes is able to concentrate enough to do some reading.

internal cardiac defibrillator.  This discharged on three occasions December through
January 2004 and plaintiff blacked out from the discharge.  Plaintiff then underwent an
AV nodal ablation on January 22, 2004, to create iatrogenic complete heart block and
prevent a tachycardiac response.  He has had a total of three discharges on his
defibrillator from which he has lost consciousness.[7]  Since the AV nodal ablation,
plaintiff has not had further discharges of the ICD device.  His ejection fraction has
improved to 42 percent measured by MUGA scan in September 2003.  Dr. Weissman
opined that the six-month driving restriction was appropriate but once a patient had been
six months free of defibrillator firing, he/she can return to operating a motor vehicle.  Dr.
Weissman opined that with an ejection fraction of 42 percent he should be able to
perform sedentary to light level of physical exertion on a full time basis.  He believed
that whether stress aggravates the condition should be referred to psychology or
psychiatric evaluation to comment.  (LL-0368)

- Liberty attempted surveillance of plaintiff on several occasions but was unable to see
  anyone in the home.  Such surveillance was ultimately conducted on September 13 and
  September 23, 2004.  It appeared that Mr. Cleveland conducted all his activities inside
  his home and did not leave the residence.  (LL-0374, LL-0286)

- September 27, 2004: objective heart testing, a non-invasive Cardiolite Treadmill Stress
  test for six minutes under Bruce Protocol.  (LL-0328)  Plaintiff's resting EKG showed
  100 percent paced underlying flutter.  Exercise EKG was indeterminate due to paced
  rhythm. Patient achieved heart rate of 100, which is 60 percent of age predicted
  maximum and 7 Mets.  Duration 6 minutes; test terminated due to fatigue.  A Cardiolite
  Myocardial Evaluation with Treadmill (LL-0327) showed impressions of a mild in size,
  mild in intensity, fixed defect involving the inferior wall following adequate exercise.
  This is compatible with diaphragmatic attenuation artifact.  Normal left ventricular
  systolic function with an estimated ejection fraction of 52 percent with no wall motion
  abnormality.  The left ventricle appeared dilated.

- October, 2004, Dr. Weissman, the reviewing cardiologist, reports that he read the letters
  from Dr. Milford and Dr. Cuevas regarding stress aggravating plaintiff's condition.  (LL-
  0332-33)  He opines that there is not supporting data to show that stress could aggravate
  or exacerbate his underlying heart condition and that there is no clinical data to show that
  his condition was adversely affected by job related stress.  (LL-0341)

- October 27, 2004, Social Security ALJ Opinion, fully favorable issued.  (LL-0267-0279)
  ALJ Blum found that plaintiff did not have the ability to perform sedentary work.  ALJ
  Blum found that plaintiff's description of his limitations was consistent with the medical

---

[7]This is why Dr. Milford has restricted plaintiff from driving.

record, the treating physician's opinion was well supported by medically acceptable clinical and laboratory findings, plaintiff cannot perform his past relevant work and is disabled as of December 14, 2003.

- March 7, 2005, Dr. Milford, plaintiff's treating cardiologist, writes to Dr. Cuevas, Liberty Life's reviewing physician:

    "It is my opinion that based on his treadmill David Cleveland could do sedentary work.  However, I do not feel that his cardiac condition allows him to do sedentary work.

    This patient has multiple complicated problems with non-ischemic cardiomyopathy, recurrent atrial fibrillation requiring multiple cardio versions and pre syncope, AICD placement, sleep apnea, post bariatric surgery, neuralgia pain, post herpes of the face, ventricular tachycardia post AV node oblation.  He has tried to return to work, has been restricted from driving, has had recurrent episodes of congestive heart failure and pre syncope, and it is my opinion that he should continue to be disabled for multiple medical problems including cardiac problems.

    Just because he could perform sedentary work based on treadmill does not mean that his cardiac status enables him to return to work.  Based on his overall medical picture, and caring for him for many years, each time he has tried to return to work he has had a significant medical problem develop and it remains my opinion that he should be off work although he was able to achieve a treadmill beyond 5 METS."

    (LL 0302)

- March 15, 2005, Dr. Laura Don, Liberty Life's reviewer, completed a psychiatric file review concluding that there was evidence of a psychiatric disorder of depression, but that by August 2004, the depression had improved and was no longer disabling.  (LL 0283-286)  She was aware of the Social Security Administration Award Letter, as she referenced it in her review.  (LL-0285)  She also referenced the surveillance.  (LL-0286)

- November 10, 2004: Hospital records from Pontiac Osteopathic Hospital showed that plaintiff was seen by Dr. David Drasnin, Ph.D., for follow up psychological evaluation. Plaintiff was coping better but still had depression, he was to continue his therapy and return in three months.

- September 29, 2005, Dr. Robert Weiner, M.D., opined that plaintiff did not have a psychological impairment after March 28, 2005.  Further, he opined that the medical

records did not indicate that plaintiff's work played a causal or exacerbating role in his cardiac illness.  (LL-0156)

• September 22, 2005, Dr. Dianne Zwicke, M.D., reports that she reviewed plaintiff's records and opined that plaintiff could work.  He has not had a syncopal episode and the driving "restriction would no longer apply."  (LL-0138)  He would be able to function in a full time sedentary capacity.  His cardiac disorders are stable, he would have to undergo regular cardiac monitoring, visits every two or three months to his doctor, occasionally have echocardiograms, 24-hour Holter monitors, and stress testing and have the defibrillator battery checked.  (LL-0139)

• October 5, 2005, Teresa Marques, vocational consultant, opines that plaintiff could do the job of computer systems analyst.  The job, because it deals with a number of tasks simultaneously, requires the ability to concentrate and pay close attention to detail.  Sometimes such a person works independently, other times in teams on large projects.  The job requires logical thinking, concentration, attention to detail, and simultaneously handling a number of tasks and communicating with others.  (LL-0129)

Benefits were terminated by Liberty by letter dated March 30, 2005.

## E.  ANALYSIS

*Arguments of Liberty Life*

Defendant Liberty Life argues that it determined after review of the doctor's notes and tests that plaintiff had been suffering from a cardiac impairment for an extended period of time but the objective test results and records further demonstrated that his condition improved during 2003 and 2004.  His left ventricular function went from 25 percent  in 2001 to 42 percent in September 2003.  (LL-0648)  Plaintiff's stress test of May 12, 2003, showed him performing at 5 METS.[8]  (LL-0651)  Plaintiff saw psychologist Dr. Drasnin from May 12, 2004, at least through June, 2004.  (LL-0620 through LL-0627)

_____

[8]It should be noted that less than 5 METs and an ejection fraction of 30 percent meets the Listings of Impairments for Social Security disability.  See, 20 C.F.R. Pt. 404, Subpt. P, App. 1 4.02.

Liberty Life submitted the medical evidence to its consulting physicians.  On July 27, 2004, Dr. Thomas Cuevas opined that plaintiff had a history of recurrent arterial fibrillation and a recent history of ventricular tachycardia, but that this condition was successfully managed with ICD implantation.  Dr. Cuevas further noted that plaintiff's treating physician had reported plaintiff's condition as stable, without any new episodes of firing from the ICD device.  (LL-0470)  Dr. Cuevas concluded that based on the medical records, plaintiff could perform his sedentary job, but recommended that Liberty Life contact plaintiff's treating cardiologist to obtain more information concerning the recent June 17, 2004 office visit where plaintiff reported dizziness, fatigue, and shortness of breath.  (LL-0470)  Defendant contends that it had Dr. Milford's reports reviewed by Dr. Weissman as well as Dr. Cuevas and Dr. Weissman provided a detailed explanation as to why he disagreed with Dr. Milford.  (LL-0366)  Dr. Milford did not respond to Dr. Weissman's comments.  In addition, Dr. Cuevas telephoned Dr. Milford to discuss plaintiff's work capacity.  (LL-0305)

***Plaintiff's Arguments***

Plaintiff raises several issues that he believes render the decision of Liberty Life arbitrary and capricious.

**1.  Liberty relied upon biased doctors.**

Plaintiff argues that because Drs. Cuervas, Weissman and Dr. Don are effectively employees of Liberty, and Drs. Weiner and Zwicke routinely find claimants not disabled, it is improper to rely upon them.[9]

Through this allegation, plaintiff raises concerns about a conflict of interest. This is one factor that the court considers in determining whether the decisional process was deliberate and principled. It is clear that the evaluation of the medical evidence was made by doctors who were either employees of Liberty or are associated with a firm that markets its medical review services to disability insurers. There is no overt evidence of bias. However, the Social Security benefits letter and determination of disability were before the administrator and at least some of the doctors at the time of the benefits determination and termination. No effort was made to explain why they reached a determination different from the "totally disabled" finding of Social Security. See, *Bennett*, 2008 WL 5273664 *7 (E.D. MI). In the Sixth Circuit's decision in *Glenn v. MetLife,* 461 F3d at 667, this circuit held that "an ERISA claim administrator's failure to address the Social Security Administration finding that the claimant was 'totally disabled' is yet another factor that can render the denial of further LTD benefits arbitrary and capricious. See also, *Smith v. Continental Casualty Co.,* 450 F.3d 253, 260 (citing *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 292 (6th Cir.2005)(citing *Marks v. Newcourt Credit Group,* 342 F.3d 444, 457 (6th Cir.2003).

---

[9]The court is unable to say due to lack of sufficient evidence that plaintiff's conclusions regarding Drs. Weiner and Zwicke are valid.

-13-

In addition, reference to the surveillance reports in certain doctor's opinions gives extra weight to plaintiff's arguments about fairness and conflict of interest in that they seem to raise an issue of an adversary process in the determination of the claim rather than a "full and fair" review.

**2. The failure to conduct an in-person examination.**

Liberty could have but did not ask for an in-person examination. This fact standing alone would not be sufficient to evidence an arbitrary and capricious denial. However, it does not appear that the reviewing physicians even considered this option. Given the Social Security decision and the opinion of the treating physician that plaintiff was disabled as well as the several month psychological treatment, an in-person exam would seem to have been an appropriate option. Nevertheless, it was never discussed.

In *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 292 (6th Cir.2005), the Sixth Circuit examined an ERISA case where the beneficiary claimed the insurer acted arbitrarily and capriciously when it cancelled her benefits after physicians hired by the insurer relied only upon a "pure paper" review by its physicians and did not conduct a physical examination. *Calvert,* 409 F.3d at 295. The Court stated that "though reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination-especially where the right to do so is specifically reserved in the Plan-may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* The Court ultimately determined that the insurer acted arbitrarily and capriciously in its decision to deny long-term disability benefits because the physician retained

-14-

by the insurer to review the beneficiary's file made determinations from a mere "file review" on

the credibility of the beneficiary and her physicians, without making an in-person examination.

*Id.* at 296-97.  In further support of its decision that the insurer acted arbitrarily and capriciously,

the Court noted that the physician retained by the insurer never addressed "head-on" the

conclusions made by the beneficiary's physicians.  *Id.* at 297.

**3.  The reviewing doctors selectively relied on and analyzed evidence and ignored overwhelming evidence of disability.**

The opinion of the treating doctor was given little to no weight by the reviewing doctors.

Since none of them had examined plaintiff and the Social Security agency found the opinion of

the treating physician consistent with the medical evidence, the absence of a reason to set it aside

is indicative of an inappropriate disregard for the conclusion.

**4.  Liberty/MLS doctors did not explain how someone in plaintiff's condition could be expected to function on a daily basis in a working environment.**

The vocational assessment describing the requirements of the position sets forth mentally

demanding work.  Liberty's doctors found that plaintiff could work but would need a continuing

series of medical visits, studies, and tests on an ongoing basis.  It is difficult to see how such

needs would not interfere with the demands of work.  Further, the job requires plaintiff to work

independently, and with a team, to concentrate and simultaneously manage several tasks.  It is

difficult to reconcile the job requirements outlined by the vocational expert with the opinions of

the reviewing doctors concluding that plaintiff could return to his own occupation.

**5.  MLS doctors do not explain why they disagreed with Dr. Milford's conclusions.**

Plaintiff is correct in this regard. See discussion in #3.

**6.  Liberty failed to offer any reasons for rejecting Dr. Milford's conclusions**.

That is also true.  However, as to both 5 and 6, it is well settled that opinions of treating physicians in ERISA litigation are not entitled to any special weight.  But they cannot be ignored. In ERISA cases, unlike Social Security disability cases, the "treating physician rule" does not apply.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).  In this case, Liberty Life considered both the opinion of Dr. Milford as well as the report of Dr. Weissman who provided his opinion on plaintiff's findings.  (LL-0440, 0366)  Liberty Life sent the report to Dr. Milford and asked him to comment.  Apparently, Dr. Milford did not respond.  (LL 0334) Dr. Cuevas reviewed plaintiff's medical records and called Dr. Milford to discuss plaintiff's work capacity.  (LL-0305)  There is apparently no record of this conversation in the file.  Also presented to the reviewing physicians were the separate psychological evaluations which do discuss plaintiff's depression, anxiety, and other disabling mental impairments.

Dr. Milford wrote then that based on the treadmill test alone, plaintiff could do sedentary work.  Dr. Milford's conclusion that "I do not feel that his cardiac condition allows him to do sedentary work" took into account plaintiff's co-morbidities of herpes zoster, depression, anxiety, and past difficulty with the defibrillator.  Liberty's doctors concluded that plaintiff could work based on included findings in the medical records and what those findings would mean generally. They did not give reasons for rejecting the treating physician's opinion.

-16-

**7. Liberty and the reviewing doctors disregarded the medications plaintiff was taking.**

This is true.  No one discusses the side effects of the medications or whether the use of the wide variety of medications would indicate a severe, disabling condition or impair plaintiff's concentration, attention to detail, and ability to multi-task.

**8. Liberty failed to ask plaintiff to participate in an IME or an FCE.**

This is also true but not required under the Plan.

**9. Liberty failed to address the decision of the Social Security Administration.**

That is true.  Under the recent Supreme Court decision in *MetLife v. Glenn*, 128 S.Ct. 2343 (2008), plaintiff is entitled to a "full and fair review of claim denials."  See also discussion in #1, referencing the Sixth Circuit's decision in *Glenn*.

**10. Liberty cherry-picked the evidence submitted to its doctors.**

There is not evidence that any information was withheld from the reviewing doctors.

**11. Liberty and its doctors disregarded fatigue.**

**12. Liberty and its doctors disregarded pain.**

Both #11 and #12 appear to be supported in Liberty's documents.  See discussion in #7. The review doctors did not discuss pain as a non-exertional factor on plaintiff's ability to work. Complaints of pain, both cardiac and facial pain, are replete in the medical records and have a substantial medical basis.  There is no evidence that plaintiff was anything but fully credible in this regard.

**13. Liberty and its doctors minimized or failed to consider how the stress of returning to work could adversely impact plaintiff given his cardiac condition.**

This is also true.  In the Administrative Record are numerous print outs from the Mayo Clinic website.  This information was before the physicians and the administrator.  At LL-0228, stress and its effect on the cardiovascular system, nervous system, and skin conditions are discussed.  These factors clearly impact plaintiff's ability to work.  Plaintiff had experienced a number of these factors.  One suggestion by the Mayo Clinic was for a person to change the environment so that the demands were not as high.  Plaintiff's occupation was one requiring complex tasks, attention to detail, and concentration.  These stressors were not part of the considerations in determining that plaintiff could work.  The absence of this merits against finding a "full and fair review."

**14.  Liberty violated federal regulations by relying upon the same doctor and same medical review on the issues of sleep apnea and herpes for both the termination and the appeal.**

Plaintiff notes that 29 C.F.R. § 2560.503-1 requires different doctors on the appeal.  Defendant does not squarely address this concern.  Dr. Zwick and Dr. Weiner were different doctors.  It appears, however, that the administrator considered all the physicians' reports in making the determination, both those on initial denial and on appeal.

**15.  Liberty asked its reviewing doctors to evaluate whether plaintiff could perform sedentary work, not his own occupation.  Thus, they asked the wrong question and did not connect the medical data to the occupation issue.**

It appears that plaintiff is also correct on this.  Plaintiff's "own occupation" as a programmer/analyst requires a number of intellectual and mental faculties, attention to detail,

-18-

concentration, multi-tasking and complex tasks.  The medical opinions do not address these

concerns.

**16.  Liberty's assessment of whether plaintiff is psychologically disabled is seriously flawed, both procedurally and substantively**.

**16A: No in person assessment was done.**

This is true.  See discussion #2.

**16B: The MLS opinion attributed to Dr. Weiner is not what he actually wrote**.

This is not discussed by plaintiff and will not be discussed here.

**16C: Even if Dr. Weiner's opinion is credited, it is no value because he misunderstood the underlying factual treatment record.**

Plaintiff submits that plaintiff had follow up psychological care after November 10, 2004.

Dr. Weiner's conclusion that he could function because his treatment ended then would be not

reliable.  Plaintiff does not discuss what treatment he received or cite to the portions of the

Administrative Record that he relies on.  Unless such information was before the administrator,

it cannot serve as a basis to find the decision unsupported.

**16D: The opinions fail to meet the spirit of *Daubert*.**

Plaintiff recognizes that *Daubert* and the Federal Rules of Evidence do not apply to this

evaluation.  The court is unwilling to conduct an analysis of the "spirit" of an inapplicable rule,

even conceding that "junk science" has no place in administrative proceedings.  *Niam v.

Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004).  Plaintiff points to no particular findings or opinion

that fall under that category and therefore, the issue will not be discussed.

-19-

**F.  CONCLUSION**

Because it is not possible to offer a reasoned explanation for Liberty's decision based on the evidence, the court finds that its choice to rely on the reviewing physicians rather than the Social Security decision or the opinion of the treating physician renders Liberty's decision arbitrary or capricious.  *See McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161 (6th Cir. 2003).

While there is no requirement under ERISA to "accord special deference to the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), where the benefits determination is made by the same entity who will pay out the benefits, a conflict of interest factors into the court's review.  See,  *MetLife v. Glenn* 128 S.Ct. 2343 (2008).  Here, no in-person examination was conducted.  Discounting the opinion of plaintiff's treating physicians, who the court recognizes "in a close case may favor a finding of disabled," is therefore unsupported.  This is particularly true where the Social Security agency determined that the treating physician's opinion was consistent with the medical evidence, and the Plan failed to discuss why it reached an opposite conclusion.

As stated by this circuit in another Liberty Life case, we must review Liberty's denial of benefits to plaintiff under the highly deferential "arbitrary and capricious" standard, but we must take into consideration the fact that Liberty is acting under a potential conflict of interest because it is both the decision-maker, determining which claims are covered, and also the payor of those claims.  *Marks v. Newcourt Credit Group,* 342 F.3d 444, 457 (6th Cir. 2003).  Liberty's ultimate disability determination was based upon the file reviews of physicians whom Liberty selected

-20-

and paid to assess plaintiff's claim.  As the plan administrator, Liberty had a clear incentive to

contract with individuals who were inclined to find in its favor that plaintiff was not entitled to

continued LTD benefits.  *See e.g., Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, 527-528

(6th Cir. 2003).  There was an incentive for Liberty to terminate coverage or deny the claim.

Under such facts, "the potential for self-interested decision-making is evident." *Univ. Hosps. of*

*Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 846 n. 4 (6th Cir. 2000).  *See also*, *Calvert v.*

*Firstar Finance, Inc.*, 409 F.3d 286, 292-293 (6th Cir. 2005).  As stated in *Calvert*:

> "It is against this backdrop [of conflict of interest, Social Security
> favorable determinations, objective evidence, and treating
> physician opinions] that we must determine whether Liberty acted
> arbitrarily and capriciously in denying further disability benefits to
> Calvert. When we compare [the Liberty physician's] file review
> and conclusions to the thorough *objectively verifiable*
> determinations of the SSA and Calvert's treating physician, and
> consider, as we must, both Liberty's conflict of interest and the
> benefit it received from encouraging and relying upon the SSA
> disability determination [reimbursement for past LTD benefits and
> future offsets], we find that Liberty acted arbitrarily and
> capriciously and that its decision denying long-term disability
> benefits to Calvert must be reversed."

409 F.3d 286, 297 (6th Cir. 2005).

For the reasons set forth above, it is recommended that Liberty's denial of benefits be

reversed, and plaintiff's motion for judgment be granted, requiring Liberty to award benefits plus

interest from the date on which plaintiff's benefit payments ceased.

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within ten (10) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific

objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.


                    s/Virginia M. Morgan
                    Virginia M. Morgan
                    United States Magistrate Judge


Dated: January 27, 2009

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on January 27, 2009.

                         s/Jane Johnson
                         Case Manager to
                         Magistrate Judge Virginia M. Morgan